## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THOMAS HARMET, individually and on behalf of all others similarly situated, <br><br>                Plaintiff, <br><br> v. <br><br> MEDLINE INDUSTRIES, INC.; STERIS CORP.; STERIS ISOMEDIX SERVICES, INC.; ISOMEDIX OPERATIONS INC.; COSMED GROUP INC.; COSMED STERILIZATION OF ILLINOIS, INC.; VANTAGE SPECIALTY CHEMICALS, INC.; VANTAGE SPECIALTIES, INC. f/k/a PETROFERM INC.; LAMBENT TECHNOLOGIES CORP.; BASF CORP.; PPG INDUSTRIES, INC., <br><br>                Defendants. | Case No.: <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Thomas Harmet ("Plaintiff"), individually and on behalf of a putative class of all other similarly situated persons ("Class Members" or the "Class"), sues Defendants Medline Industries, Inc., Steris Corporation, Steris Isomedix Services, Inc., Isomedix Operations Inc., Cosmed Group Inc., Cosmed Sterilization of Illinois, Inc., Vantage Specialty Chemicals, Inc., Vantage Specialties, Inc. f/k/a Petroferm Inc., Lambent Technologies Corp., BASF Corp., and PPG Industries, Inc. (collectively, "Defendants") and, based on personal knowledge and on investigation of counsel and review of public documents and information, alleges as follows:

### INTRODUCTION

1.     Plaintiff brings this class action against Medline Industries, Inc., Steris Corporation, Steris Isomedix Services, Inc., Isomedix Operations Inc., Cosmed Group Inc., and Cosmed Sterilization of Illinois, Inc. (collectively, "Waukegan Defendants"), the owners and operators of manufacturing and sterilization facilities at 1160 S. Northpoint Boulevard, Waukegan,

IL 60085, ("Waukegan Facility"); and Vantage Specialties, Inc. f/k/a Petroform Inc., Vantage Specialty Chemicals, Inc., Lambent Technologies Corp., BASF Corp., and PPG Industries, Inc. (collectively, "Gurnee Defendants") the owners and operators of surfactant manufacturing facilities at 3938 Porett Drive, Gurnee, Illinois ("Gurnee Facility"), for damages resulting from Defendants' dangerous and reckless emission of Ethylene Oxide ("EtO").

2.      EtO is a powerful cancer-causing gas. The United States Environmental Protection Agency ("EPA"), the National Toxicology Program, the World Health Organization ("WHO"), and the International Agency for Research on Cancer ("IARC"), among others, all classify EtO as a known human carcinogen.

3.      Waukegan Defendants used large volumes of EtO to sterilize medical equipment and other products at the Waukegan Facility. This toxic gas was then emitted into the atmosphere by Waukegan Defendants in both controlled and uncontrolled releases. These releases occurred for several decades.

4.      Gurnee Defendants' Gurnee Facility produces surfactants—surface-acting agents—compounds that lower the surface tension between two liquids, between a gas and a liquid, or between a liquid and a solid, allowing them to bind. Surfactants may act as detergents, wetting agents, emulsifiers, foaming agents, and dispersants. The surfactant manufacturing process includes the use of EtO. Gurnee Defendants used large volumes of EtO during the manufacturing process at the Gurnee Facility, emitting the toxic gas into the atmosphere in both controlled and uncontrolled releases. These releases occurred for several decades

5.      There is no safe level of EtO. Its carcinogenic effects have been widely known since the 1940s. Nonetheless, Defendants chose to operate their Facilities and emit EtO in a densely populated area full of children, homes, parks, schools, and businesses.

6.      Plaintiff and Class Members have lived within a specified geographic area in and around the Waukegan and Gurnee Facilities and have been exposed to large amounts of toxic, cancer-causing EtO as a result of releases from Defendants' Facilities. This area is among the most toxic in the U.S.

7.      Although EtO is odorless and colorless, and Plaintiff and Class Members can neither see nor smell the gas; it is and was all around them and in the air they breathed. Class Members unknowingly breathed in EtO when they brushed their teeth, pet their dogs, talked with their children about their day at school, and throughout their daily lives. Defendants never warned them about the dangerous EtO emissions that contaminated the air they breathed.

8.      As a result of their exposure to the EtO emitted by Defendants, Plaintiff and Class Members' present risk of acquiring disease is among the highest in the United States.  Indeed, the EPA estimates that Plaintiff and Class Members are nearly 5 times more likely to develop cancer than the average American. The illnesses, diseases, and disease processes that exposure to EtO can cause is often latent, meaning not easily detected, much less treated, without diagnostic testing, particularly in their early stages.

9.      The actual risks to Plaintiff and Class Members are even higher than EPA's estimate, because the EPA accounted only for emissions from the Waukegan Facility in this estimate. EPA's estimate erroneously omitted emissions from the Gurnee Facility in its risk analysis.

10.      As a result of Defendants' irresponsible and reckless conduct, Plaintiff and Class Members have been exposed to EtO, a known carcinogen and toxin. As a result of their exposure Plaintiff and Class Members suffer a present increased risk of illness, disease, and disease processes. This present increased risk of illness, disease, and disease processes has caused Plaintiff and Class Members to incur the present medical need for diagnostic testing (also known as medical monitoring) for the early detection of those illnesses, diseases, and disease processes, including

3

cancer. Medical monitoring is reasonably medically necessary for those exposed to ensure that latent disease processes can be immediately identified and aggressively treated. Plaintiff and Class Members have been injured by the present need to incur the costs of diagnostic testing for the early detection of illness, disease, or disease processes.

11.     Plaintiff, individually and on behalf of Class Members, seeks compensatory damages arising out of chemical releases, discharges, and leaks from the Waukegan and Gurnee Facilities. These damages include the cost of a medical monitoring program for continual screening and detection of illness, disease, or disease processes necessitated by the exposure to toxic EtO released by the Defendants.

## PARTIES

12.     Plaintiff Thomas Harmet is a citizen of Illinois and lives in Lake County. As a result of Defendants' operations at the Waukegan and Gurnee Facilities, Plaintiff has been exposed to, and inhaled, high levels of EtO.

### *Waukegan Defendants*

13.     Defendant Medline Industries, Inc. is an Illinois corporation with its headquarters and principal place of business at Three Lakes Drive, Northfield, Illinois 60093. At all relevant times, Medline Industries, Inc. and its predecessors in interest, owned and operated the Waukegan Facility.

14.     Defendant Steris Corp. is an Ohio corporation with its headquarters and principal place of business at 5960 Heisley Road, Mentor, Ohio 44060. It owned and operated the Waukegan Facility along with its parent companies, subsidiaries, affiliates and alter egos from approximately January 7, 2005 through September 1, 2008.

15.     Defendant Steris Isomedix Services, Inc. is a Delaware corporation with its headquarters and principal place of business at 5960 Heisley Road, Mentor, Ohio 44060. It owned

4

and operated the Waukegan Facility along with its parent companies, subsidiaries, affiliates and alter egos from approximately January 7, 2005 through September 1, 2008.

16.     Defendant Isomedix Operations, Inc. is a Delaware corporation with its headquarters and principal place of business at 5960 Heisley Road, Mentor, Ohio 44060. It owned and operated the Waukegan Facility along with its parent companies, subsidiaries, affiliates and alter egos from approximately January 7, 2005 through September 1, 2008.

17.     Defendants Steris Corp., Steris Isomedix Services, Inc., and Isomedix Operations Inc. owned and operated the Waukegan Facility, and directly participated in the operation of the Waukegan Facility at all relevant times between January 7, 2005 and September 1, 2008.

18.     Additionally, Defendants Steris Corp., Steris Isomedix Services, Inc., and Isomedix Operations Inc. constituted a joint venture in connection with the Waukegan Facility inasmuch as they agreed to undertake the ownership and operation of the facility jointly for the purpose of sharing associated profits and losses, and in connection therewith, each contributed their respective skills, property or resources in exercising control or a right of control over the facility.

19.     Defendant Cosmed Group, Inc. is a Maryland corporation with its headquarters and principal place of business at 20 Ocean Heights, Newport, Rhode Island 02840. It owned and operated the Waukegan Facility along with its parent companies, subsidiaries, affiliates and alter egos from approximately May 29, 1994 through January 7, 2005.

20.     Defendant Cosmed Sterilization of Illinois, Inc. is an Illinois corporation with its headquarters and principal place of business at 20 Ocean Heights, Newport, Rhode Island 02840. It owned and operated the Waukegan Facility along with its parent companies, subsidiaries, affiliates and alter egos from approximately May 29, 1994 through January 7, 2005.

21.     Defendants Cosmed Group Inc. and Cosmed Sterilization of Illinois, Inc. designed and operated the Waukegan Facility from inception in or about May 29, 1994, and directly

participated in the operation of the Willowbrook Facilities at all relevant times through at least January 7, 2005.

22.     Additionally, Defendants Cosmed Group Inc. and Cosmed Sterilization of Illinois, Inc. constituted a joint venture in connection with the Waukegan Facility inasmuch as they agreed to undertake the ownership and operation of the facility jointly for the purpose of sharing associated profits and losses, and in connection therewith, each contributed their respective skills, property or resources in exercising control or a right of control over the facility.

23.     Upon information and belief, Medline Industries, Inc. has assumed the liabilities of all predecessor entities for their respective involvement in the operation of the Waukegan Facility.

### *Gurnee Defendants*

24.     Defendant Vantage Specialty Chemicals, Inc. is a Delaware corporation with its headquarters and principal place of business at 4650 South Racine Avenue, Chicago, Illinois 60609. It is the parent company of Defendants Vantage Specialties, Inc. and Lambent Technologies Corp.

25.     Defendant Vantage Specialties, Inc. f/k/a/ Petroferm Inc. is a Delaware corporation with its headquarters and principal place of business at 4650 South Racine Avenue, Chicago, Illinois 60609. It is a subsidiary of Defendant Vantage Specialty Chemicals, Inc.

26.     Defendant Vantage Specialty Chemicals, Inc. is a Delaware corporation with its headquarters and principal place of business at 4650 South Racine Avenue, Chicago, Illinois 60609. It is a subsidiary of Defendant Vantage Specialty Chemicals, Inc.

27.     Defendant Lambent Technologies Corp. is an Illinois corporation with its headquarters and principal place of business at 4650 South Racine Avenue, Chicago, Illinois 60609. It is a subsidiary of Defendant Vantage Specialty Chemicals, Inc.

28.     At all relevant times, Defendants Vantage Specialties, Inc. f/k/a Petroferm Inc., Vantage Specialty Chemicals, Inc. and Lambent Technologies Corp., and their predecessors in interest, owned and operated the Gurnee Facility.

29.     Defendants Vantage Specialties, Inc. f/k/a Petroferm Inc., Vantage Specialty Chemicals, Inc. and Lambent Technologies Corp. owned and operated the Gurnee Facility, and directly participated in the operation of the Gurnee Facility at all relevant times between approximately July 15, 2003 and the present.

30.     Additionally, Defendants Vantage Specialties, Inc. f/k/a Petroferm Inc., Vantage Specialty Chemicals, Inc. and Lambent Technologies Corp. constituted a joint venture in connection with the Gurnee Facility inasmuch as they agreed to undertake the ownership and operation of the facility jointly for the purpose of sharing associated profits and losses, and in connection therewith, each contributed its respective skills, property or resources in exercising control or a right of control over the facility.

31.     Defendant BASF Corp. is a Delaware corporation with its headquarters and principal place of business at 100 Park Avenue, Florham Park, NJ 07932. It owned and operated the Gurnee Facility along with its parent companies, subsidiaries, affiliates and alter egos from approximately August 28, 1997 through July 15, 2003.

32.     Defendant PPG Industries, Inc. is a Pennsylvania corporation with its headquarters and principal place of business at One PPG Place, Pittsburgh, PA 15272. It owned and operated the Gurnee Facility along with its parent companies, subsidiaries, affiliates and alter egos from approximately January 5, 1987 through August 28, 1997.

33.     Upon information and belief, Vantage Specialty Chemicals, Inc. has assumed the liabilities of all predecessor entities for their respective involvement in the operation of the Gurnee Facility.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 100 putative Class Members, and at least some Members of the proposed Class have a different citizenship from one of the Defendants.

35.     This Court has jurisdiction over Defendants because they operated industrial facilities in this District. Through their regular business operations in this District, Defendants intentionally and regularly availed themselves of the markets and jurisdiction in this District, conferring this Court with personal jurisdiction over Defendants.

36.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events and omissions giving rise to this action occurred in this District, Defendants' operations in this District emitted EtO within this District, causing harm to Plaintiffs and Class Members residing in this District.

## STATEMENT OF FACTS

A.     **ETHYLENE OXIDE**

37.     EtO is a colorless, odorless gas used in the manufacture of antifreeze, solvents, detergents, polyurethane foam, adhesives and other products. It is also used to sterilize medical equipment and plastic devices.[1]

38.     Commercial sterilizers, such as the Waukegan Defendants, use EtO to sterilize healthcare products and other items. The EtO sterilization process begins by placing products in a gas chamber. After air is pumped out of the chamber, EtO is introduced to diffuse into the products

---

[1] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/background-information-ethylene-oxide#what

for several hours. Once the products are sterilized, EtO is pumped out of the gas chamber and the remaining EtO is allowed to slowly dissipate.

39.     Commercial chemical producers, such as the Gurnee Defendants, process EtO to synthesize Ethylene Glycol, a building block for synthetic fibers (e.g., upholstery, carpet), plastics, PVC pipe and cosmetics; EtO is a primary ingredient in antifreeze.[2] EtO is also used to produce surfactants, which are used as detergents, wetting agents, emulsifiers, foaming agents, and dispersants.

40.     At the end of 2018, EtO was being produced in the U.S. at 15 facilities in 11 locations by 9 companies.[3]

41.     Waukegan Defendants' Waukegan Facility sterilizes products and emits huge volumes of EtO gas every year. Since at least 1994, the Waukegan Facility emitted multiple tons of EtO gas into the air of the geographic area in which Plaintiff and Class Members reside.

42.     Gurnee Defendants' Gurnee Facility plant manufactures, processes and/or uses and also emits significant amounts of EtO gas every year. Since at least 1988, the Gurnee Facility has emitted multiple tons of EtO gas into the air of the geographic area in which Plaintiff and Class Members reside.

43.     Unfortunately, people cannot see or smell EtO when it is in the air.[4]  As such, Plaintiff and Class Members have unknowingly been exposed to toxic EtO for decades while Defendants knew, or should have known, that the EtO it was releasing was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

---

[2] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions
[3] https://www.americanchemistry.com/EO/Ethylene-Oxide-Frequently-Asked-Questions.html
[4] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions

B.    **HEALTH EFFECTS OF ETHYLENE OXIDE EXPOSURE**

44.    EtO is one of 187 pollutants that EPA has classified as "hazardous air pollutants," also called "air toxics."  It is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body.  Its deleterious properties have been widely known for decades.

45.    While acute inhalation exposure to high concentrations of EtO can cause headache, dizziness, nausea, fatigue, respiratory irritation, vomiting, and other types of gastrointestinal distress, studies show that exposure to EtO increases the risk of lymphohematopoietic cancers, including, but not limited to, lymphoma, myeloma, and leukemia. Studies also show that long-term exposure to EtO increases the risk of breast cancer in females.[5]

46.    Manufacturers and users of EtO became aware of its carcinogenic effects at least by 1977, when the National Institute of Occupational Safety and Health ("NIOSH") recommended that EtO be considered as mutagenic and potentially carcinogenic to humans, that occupational exposure be minimized, and that alternate sterilization procedures be used.[6]  In 1981, based on additional laboratory studies wherein EtO induced cancer in animals, NIOSH confirmed its concerns that EtO was a potential occupational carcinogen.[7]

47.    In 1985, the United States Department of Health and Human Services ("DHHS") published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

48.    In 1987, the state of California officially designated EtO a carcinogen.

---

[5] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/frequent-questions-health-information-about-ethylene-oxide
[6] Center for Disease Control & Prevention, Special Occupational Hazard Review With Control Recommendations: Use Of Ethylene Oxide As A Sterilant In Medical Facilities, August 1977, https://www.cdc.gov/niosh/docs/77-200/default.html
[7] Center for Disease Control, Current Intelligence Bulletin 35, May 1981, EtO: Evidence of Carcinogenicity, https://www.cdc.gov/niosh/docs/81-130/default.html

49.     NIOSH subsequently published an epidemiological study of EtO which analyzed over 18,000 employees working with EtO at 14 different industrial facilities. The study found sufficient evidence to support a causal link between exposure to EtO and increased mortality from lymphatic and hematopoietic cancers.[8]

50.     As a result of these findings and others, in 1994 the WHO listed EtO as a Group 1 human carcinogen, the body's highest risk classification. In 2000, the U.S. Department of Health and Human Services revised its classification for EtO as "known to be a human carcinogen."

51.     Exposure to EtO has been widely studied and its negative health effects are well documented.[9] Presently, there is evidence linking EtO exposure to increased risk of lymphatic and hematopoietic cancer such as lymphomas, myelomas, and leukemias; breast cancer; tumors in the lungs, uterus, and the brain; cancers in connective tissues and bones; and reproductive and developmental impairments including increased rates of miscarriage and infertility.

52.     EPA classified EtO as a human carcinogen in December 2016 and considers any exposure, however small, to create a cancer risk. This is because EtO is a powerful mutagen and can damage DNA.[10]

## C.     DEFENDANTS' ETHYLENE OXIDE EMISSIONS

53.     From at least 1988 through December 2019, the Gurnee Facility released huge volumes of EtO into the air in the Class Zone. From 1994 up and through the recent temporary closure in January 2020, the Waukegan Facility released huge volumes of EtO into the air in the Class Zone.

---

[8] Steenland, K, *et. al.,* Mortality analyses in a cohort of 18,235 ethylene oxide exposed workers: Follow up extended from 1987 to 1998 (2004), Occup Environ Med 61:2-7, https://www.ncbi.nlm.nih.gov/pubmed/14691266
[9] https://www.epa.gov/sites/production/files/2016-09/documents/ethylene-oxide.pdf
[10] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/frequent-questions-health-information-about-ethylene-oxide

54.     The EtO emitted by Defendants' facilities is carried by ambient air movements throughout the Class Zone defined below. The EtO remains in the air for months, becomes concentrated in atmospheric inversions, and moves through neighboring communities through prevailing winds. Because its half-life in the atmosphere is 211 days, EtO remains in the air that Plaintiff and Class Members breathe long after the EtO has been emitted.[11]

55.     In addition, EtO is heavier than air, meaning that it can linger and travel along the ground.[12] Consequently, Defendants' continuing releases of EtO are likely to have lingered at breathing level in the communities around the Waukegan and Gurnee Facilities for a considerable time, causing ongoing and prolonged harm to Plaintiff and Class Members.

56.     Unfortunately, people cannot see or smell EtO when it is in the air.[13] As such, Plaintiff and Class Members have unknowingly been exposed to EtO for decades while Defendants knew, or should have known, that the EtO they were releasing into local communities was dangerous, toxic, carcinogenic, mutagenic, and harmful.

**D.     LAKE COUNTY AIR QUALITY AND THE HEALTH IMPLICATIONS**

57.     Cosmed Group Inc., and Cosmed Sterilization of Illinois, Inc. (collectively "Cosmed") first used the Waukegan Facility in 1994 to provide sterilization services for medical devices, pharmaceuticals, packaging, cosmetics, seeds, and spices. The Waukegan Facility holds ten gas chambers and two aeration rooms.

58.     Cosmed violated numerous regulatory requirements during its operation of the Waukegan Facility. For several years, it failed to operate its aeration room vents such that EtO emissions were reduced by at least 99%, in violation of 40 CFR 63.360(g) and 40 CFR 362. It failed

---

[11] https://www.ncbi.nlm.nih.gov/books/NBK321408/
[12] https://www.atsdr.cdc.gov/mmg/mmg.asp?id=730&tid=133
[13] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions

to conduct initial performance testing of the aeration room vent control equipment, in violation of 40 CFR 63.7, 40 CFR 63.363, and 40 CFR 63.365 and again failed to complete such testing within 180 days of the compliance date required by 40 CFR 63.363(a)(1) and (a)(2).

59.     As a result of these violations, Cosmed caused EtO emissions to exceed allowable limits in the ambient air.

60.     Cosmed's failure to use required EtO emission control technologies resulted in a $500,000 civil penalty.

61.     In January 2005, as Cosmed was facing prosecution for its egregious failures, it transferred ownership and operation of the Waukegan Facility to Steris Corp., Steris Isomedix Services, and Isomedix Operations Inc., who owned and operated the facility until approximately September 2008.

62.     In 2008, the Waukegan Facility was sold to Medline Industries, Inc., who has owned and operated the facility ever since.

63.     By the time Medline acquired the Willowbrook Facilities in 2008, the Waukegan Facility had been continuously operating and providing sterilization services for approximately 14 years.

64.     Upon information and belief, Medline acquired all or substantially all of Waukegan Facility's assets from all predecessors, and continued to utilize these assets to provide sterilization services in essentially the same manner as all previous owners and operators of the Waukegan Facility since 1994, including, but not limited to, the entities named in the above paragraphs.

65.     Waukegan Defendants' Waukegan Facility has exposed Class Members to hazardous levels of EtO since beginning operations in 1994.

66.     The Gurnee Facility was acquired by PPG Industries in or around 1987, and was utilized to manufacture surfactants, polysorbates, and alkoxylate esters.

67.     PPG Industries owned and operated the Gurnee Facility until 1997, when BASF acquired ownership and operations of the facility. BASF continued to manufacture surfactants, polysorbates, and alkoxylate esters at the Gurnee Facility until 2003, when BASF sold the ownership and operations of the facility to Vantage Specialties Inc. (doing business under Vantage's former trade name of Petroferm Inc. through [[its]] subsidiary Lambent Technologies Corp).

68.     In October 2008, Vantage Specialty Chemicals, Inc. acquired Lambent Technologies Corp. and Lambert Technologies Corp.'s corporate parent, Vantage Specialties Inc. (doing business under Vantage's former trade name Petroferm Inc). In 2015, Lambent Technologies Corp. and Petroferm Inc. merged to become Vantage Specialties Inc.

69.     By the time Vantage Specialty Chemicals, Inc. acquired the Gurnee Facility in 2008, the Facility had been continuously operating providing sterilization services for 14 years.

70.     Upon information and belief, Vantage Specialty Chemicals, Inc. acquired all or substantially all of the Gurnee Facility's assets from all predecessors, and continued to utilize these assets for surfactant manufacturing, in essentially the same manner as all previous owners and operators of the Gurnee Facility since at least 1987, including, but not limited to, the entities named in the above paragraphs.

71.     EtO arrives at the Gurnee Facility in pressurized railroad cars and is transferred to pressurized storage tanks at the facility. The EtO is then transferred to the alkoxylation area, where it is used as a raw material for the facility's alkoxylation reactors. EtO remaining after the alkoxylation process is vented.

72.     Piping for transferring EtO between the railcars, the storage tanks, and the alkoxylation area at the Gurnee Facility contains components such as pumps, pressure relief devices, valves, connectors, and flanges that are known to fail and cause fugitive emissions of EtO.

73.     Uncontrolled, fugitive emissions of EtO have been a major source of air contamination from the Gurnee Facility. In addition to the unsafe level of controlled releases of EtO, the Gurnee Facility has caused tons of EtO to escape to the atmosphere in uncontrolled, fugitive emissions. In 2010 alone, the Gurnee Facility had more than 4 tons of fugitive EtO emissions.

74.     Gurnee Defendants' Gurnee Facility have exposed Class Members to hazardous levels of EtO since at least 1988.

75.     Both Gurnee Defendants and Waukegan Defendants knew, or should have known, that exposure to EtO is extremely toxic to human beings and causes several different types of cancer. Notwithstanding this knowledge of the dangers of operating their operations, and the adverse health impacts of chronic inhalation of EtO, Defendants and their predecessors chose to operate the Waukegan and Gurnee Facilities in a densely populated residential area, and emitted thousands of pounds of EtO into the environment without providing any warnings to those who lived and worked nearby.

76.     The EPA's 2014 National Air Toxics Assessment ("NATA") demonstrated severe cancer risks in the area surrounding the Waukegan and Gurnee Facilities. The 2014 NATA places the cancer risks of the census tracts measured in and around these facilities among the highest in the country.

77.     The NATA database also makes clear that the elevated cancer risks in and around this area are almost entirely a result of Defendants' EtO emissions.

78.     While the 2014 NATA reveals shockingly high risks of cancer across a large area near the Willowbrook Facilities, these risks are understated as they did not reflect the totality of Defendants' emissions.

79.     For example, while the 2014 NATA utilized emission data from the Waukegan Facility to estimate cancer risks in the Class Zone, it erroneously excluded emissions data from the Gurnee Facility.

80.     Because the 2014 NATA does not account for EtO emissions from the Gurnee Facility, the true cancer risks to plaintiff and class members are even higher than stated in EPA's analysis.

81.     Throughout the Class Period, as defined below, the area around the Waukegan and Gurnee Facilities has contained numerous homes and businesses, as well as numerous schools and daycare facilities. As a result, thousands of residents have been exposed to elevated levels of EtO.

82.     Defendants operated without sufficient pollution controls to adequately limit and/or eliminate the emissions of toxic EtO and, as a result, exposed the thousands of residents in the Class Zone defined below to a carcinogenic, mutagenic chemical that increased their likelihood of developing cancer.

83.     Waukegan Defendants knew that: (1) their Waukegan Facility operated without sufficient pollution control systems necessary to reduce or eliminate releases of toxic EtO; (2) the release of EtO spread well beyond the property boundaries of the Waukegan Facility and resulted in exposure to residents in the Class Zone defined below; and (3) on-going exposure to EtO, a known carcinogen, would result in the increase of the risk of illness, disease, or disease processes for nearby residents and an increase the likelihood that nearby residents would develop cancer.

84.     Gurnee Defendants knew that: (1) their Gurnee Facility operated without sufficient pollution control systems necessary to reduce or eliminate releases of toxic EtO; (2) the release of EtO spread well beyond the property boundaries of the Gurnee Facility and resulted in exposure to residents in the Class Zone defined below; and (3) on-going exposure to EtO, a known carcinogen,

16

would result in the increase of the risk of illness, disease, or disease processes for nearby residents and an increase the likelihood that nearby residents would develop cancer.

85.     Defendants negligently failed to implement control processes that would eliminate EtO emissions, failed to adopt alternative processes that would eliminate EtO emissions, and failed to warn the Plaintiff and Class Members that the air was contaminated with toxic levels of EtO.

86.     Throughout the course of their operation of the Waukegan Facility, Waukegan Defendants released EtO into the environment and failed to remediate the contamination.

87.     Throughout the course of their operation of the Gurnee Facility, Gurnee Defendants released EtO into the environment and failed to remediate the contamination.

88.     Defendants' conduct unnecessarily contaminated the air Plaintiff and Class Members breathe every day, and exposed Plaintiff and Class Members to unsafe air. As a result, Plaintiff and Class Members have inhaled toxic EtO released from Waukegan Defendants' Waukegan Facility and Gurnee Defendants' Gurnee Facility.

**E.     PLAINTIFF AND CLASS MEMBERS HAVE ALREADY SUFFERED DAMAGES AND REQUIRE DIAGNOSTIC TESTING**

89.     Plaintiff and Class Members have lived within the vicinity of the Waukegan and Gurnee Facilities during the time Defendants and their predecessors in interest have been emitting and exposing residents of nearby areas to toxic levels of EtO.

90.     As a result of Defendants' tortious, negligent and reckless emissions of EtO, Plaintiff and Class Members have inhaled toxic EtO, and have suffered significant exposure to hazardous EtO gases relative to the general population in the U.S.

91.     EtO is a proven hazardous substance. It is a human carcinogen and is unsafe for humans at any level of exposure.

92.     Plaintiff and Class Members have lived in census tracts which present more than a doubled increase in the likelihood of developing cancer as compared to the vast majority of the U.S. population living in other areas.

93.     As a proximate result of Defendants' tortious, negligent and reckless conduct, Plaintiff and Class Members are at an increased risk of developing cancer, and other illness, disease, and disease processes, resulting in their present medical need for periodic diagnostic medical examinations.

94.     Diagnostic testing for early detection of cancer and other illness, disease, and disease processes caused by exposure to EtO is reasonably medically necessary to assure early diagnosis and effective treatment of the disease.

95.     Plaintiff and Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illness, disease, and disease processes. As a result of their significant exposure to Defendants' hazardous EtO gases, Plaintiff and Class Members require an award of the cost of a medical monitoring program necessary for early detection of the onset of illnesses, diseases, or disease processes.

96.     Monitoring procedures exist that make possible the early detection of cancer, the disease processes of cancer, and the progression of biomarker abnormalities, and other illness, disease, and disease processes. These monitoring procedures will benefit Plaintiff and Class Members, and they are different from what would normally be recommended in the absence of EtO exposure. Such diagnostic testing is reasonably medically necessary due to the exposure of Plaintiff and Class Members to Defendants' EtO hazardous emissions. Plaintiff and Class Members have been injured by the present need to incur the costs of such diagnostic testing for the early detection of illness, disease, or disease processes.

97.     Plaintiff's and Class Members' claims are based solely on the amount of exposure to EtO released from Defendants' Waukegan and Gurnee Facilities. Therefore, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiff's and Class Member's claims in this case.  Exposure greater than the minimum specified in the class definition below only increases the risk Plaintiff and the Class Members suffer over the baseline risk caused by Defendants' tortious conduct.

98.     As a direct result of Defendants' tortious and reckless conduct, Plaintiff and the Class have a present need to incur the cost of the costly diagnostic testing, and the cost of the monitoring procedures that are reasonably necessary to enable Plaintiff and Class Members to obtain early detection and diagnosis of medical conditions, including abnormalities indicative of cancer.

99.     Plaintiff and Class Members seek as damages the costs of a medical monitoring program for such diagnostic testing for the early detection of onset of illnesses, diseases, or disease processes and to allow for early treatment beneficial to Plaintiff and Class Members.

100.     Plaintiff and Class Members also seek all other available and necessary relief in connection with this claim.

## CLASS ALLEGATIONS

101.     Plaintiff seeks relief on behalf of himself and as representative of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of a class defined as follows:

> All natural persons who have resided within census tracts 17097861504, 17097862800, 17097862605, 17097862604, 17097863201, 17097862502; 17097861507, 17097861508, 17097861506, 17097861902, 17097861901, 17097861804, 17097861803, 17097866100; 17097861510, 17097862603, 17097862000, 17097862501, 17097862402 (the "Class Zone") for a period of one year or more at any time between January 1, 1988 and December 31, 2019 (the "Class Period").

102.    Excluded from the Class are Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; all persons who have been currently diagnosed with cancer; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

103.    Plaintiff hereby reserves the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery.

104.    The proposed Class meets the criteria for certification under Fed R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4).

105.    **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the Members of the Class are so numerous and geographically dispersed that the joinder of all Members is impractical. While the exact number of Class Members is unknown to Plaintiff at this time, the proposed Class includes thousands of current and former residents who were unlawfully exposed to EtO. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

106.    **Commonality. Rule 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

     a.    Whether Defendants' conduct was negligent;

     b.    Whether Defendants' conduct constitutes a public nuisance;

     c.    Whether Defendants' conduct constitutes an abnormally dangerous activity;

d.  Whether Defendants owed a duty of care to Class Members;

e.  Whether the duty of care owed to the Class included the duty to protect against exposures to unsafe and unnecessarily high levels of EtO emissions;

f.  Whether Defendants breached their duty to warn the Class of and protect the Class from the long-term health risks and consequences of exposure to high levels of EtO;

g.  Whether medical monitoring and early detection will provide benefits to Members of the Class; and

h.  Whether Plaintiffs and Class Members are entitled to relief.

107.  **Typicality. Rule 23(a)(3).**  Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of the putative Class Members. Plaintiff has resided in census tract 17097861504, within the Class Zone surrounding the Waukegan and Gurnee Facilities, and resided in the Class Zone for over one year during the Class Period.  Plaintiff has had exposure to EtO released from the Waukegan and Gurnee Facilities as have all Class Members.  That exposure has resulted in an increased risk of illness and disease in Plaintiff as it has in all class members. Plaintiff has the same, reasonably medically necessary, need to incur the cost of diagnostic testing for the early detection of illness and disease as all Class Members. Plaintiff therefore seeks the same relief as Class Members: the cost of a medical monitoring program for the early detection of illness, disease, or disease processes.

108.  **Adequacy. Rule 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a Member of the Class and is committed to pursuing this matter against Defendants to obtain relief for the Class.   Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members.

109. **Superiority. Rule 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

110. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

111. Likewise, particular issues are appropriate for certification under Rule 23(c)(4) because such claims present particular common issues, the resolution of which would advance the disposition of this matter and the parties' interests.

112.    Finally, all members of the proposed Class are readily ascertainable as they are all current or former residents of defined census tracts. Class Members can be identified, and their contact information ascertained for the purpose of providing notice to the Class

## COUNT I

## ULTRAHAZARDOUS ACTIVITY/STRICT LIABILITY—WAUKEGAN DEFENDANTS

113.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

114.    As successors and owners of the Waukegan Facility, Waukegan Defendants' use and emissions of EtO at their Waukegan Facility constituted an ultrahazardous activity.

115.    Sterilization using EtO is abnormally dangerous and cannot be made safe by the exercise of the utmost care. The sterilization procedures utilized at the Waukegan Facility resulted in emissions of EtO to the Class Zone, which pose a high degree of risk to Plaintiff and Class Members.

116.    There is a reasonable likelihood that the emissions of EtO will result in life-threatening cancer and other illness, disease, and disease processes. This risk cannot be eliminated as long as EtO is emitted into populated areas. Likewise, it was completely inappropriate for Waukegan Defendants to locate and operate their Waukegan Facility in a populated area while at the same time causing large amounts of EtO to be emitted into the atmosphere.

117.    Waukegan Defendants' emission of EtO created a high degree of risk of harm to those who live in the surrounding area and substantially increased their risk of developing cancer and other illness, disease, or disease processes.

118.    The activities conducted by Waukegan Defendants are exceedingly dangerous and offer little or no value to the surrounding community.

119.     Because these activities are ultrahazardous, Waukegan Defendants are strictly liable for any injuries proximately resulting therefrom.

120.     As a direct and proximate result of Waukegan Defendants' ultrahazardous activity and the exposure to EtO resulting therefrom, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease, or disease processes, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease, or disease processes. Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

## COUNT II

## ULTRAHAZARDOUS ACTIVITY/STRICT LIABILITY—GURNEE DEFENDANTS

121.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

122.     As successors and owners of the Gurnee Facility, Gurnee Defendants' use and emissions of EtO at their Gurnee Facility constituted an ultrahazardous activity.

123.     The transport, processing and use of EtO for manufacturing surfactants and operating alkoxylation reactors is abnormally dangerous and cannot be made safe by the exercise of the utmost care. The transport, processing, and manufacturing procedures utilized at the Gurnee Facility resulted in emissions of EtO to the Class Zone, which pose a high degree of risk to Plaintiff and Class Members.

124.     There is a reasonable likelihood that the emissions of EtO will result in life-threatening cancer and other illness, disease, and disease processes. This risk cannot be eliminated as long as EtO is emitted into populated areas. Likewise, it was completely inappropriate for Gurnee Defendants to locate and operate their Gurnee Facility in a populated area while at the same time causing large amounts of EtO to be emitted into the atmosphere.

125.    Gurnee Defendants' emission of EtO created a high degree of risk of harm to those who live in the surrounding area and substantially increased their risk of developing cancer and other illness, disease or disease processes.

126.    The activities conducted by Gurnee Defendants are exceedingly dangerous and offer little or no value to the surrounding community.

127.    Because these activities are ultrahazardous, Gurnee Defendants are strictly liable for any injuries proximately resulting therefrom.

128.    As a direct and proximate result of Gurnee Defendants' ultrahazardous activity and the exposure to EtO resulting therefrom, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease, or disease process, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease, or disease processes. Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

## COUNT III

## PUBLIC NUISANCE—WAUKEGAN DEFENDANTS

129.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

130.    At all times relevant hereto, Waukegan Defendants, as successors and owners of the Waukegan Facility, knew EtO to be hazardous and harmful to human beings.

131.    Plaintiff and Class Members have a common right to breathe clean air without dangerous levels of carcinogens such as EtO.

132.    Waukegan Defendants' unreasonable use and emission of EtO at their Waukegan Facilities substantially and unreasonably infringes upon and transgresses this public right.

133.    Waukegan Defendants knew or should have known that the levels of EtO gas emitted from their Waukegan Facility would have a deleterious effect upon the health, safety, and well-being of people living in the nearby areas.

134.    Waukegan Defendants' operation of their Waukegan Facilities caused those who live in the surrounding area to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

135.    As a proximate result of the Waukegan Defendants' operation of the Waukegan Facility, Plaintiff and the general public's common right to breathe clean air without dangerous levels of carcinogens such as EtO was eliminated and/or severely diminished.

136.    As a proximate result of Waukegan Defendants' operation of their Waukegan Facility, EtO continuously invaded and contaminated the areas surrounding Plaintiff's and Class Members' residences, thereby exposing them to EtO.

137.    As a direct and proximate result of Waukegan Defendants' creation of a public nuisance and the exposure to EtO resulting therefrom, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease, or disease processes, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease, or disease processes. Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

**COUNT IV**

**PUBLIC NUISANCE—GURNEE DEFENDANTS**

138.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

139.    At all times relevant hereto, Gurnee Defendants, as successors and owners of the Gurnee Facility, knew EtO to be hazardous and harmful to human beings.

26

140.    Plaintiff and Class Members have a common right to breathe clean air without dangerous levels of carcinogens such as EtO.

141.    Gurnee Defendants' unreasonable use and emission of EtO at their Gurnee Facilities substantially and unreasonably infringes upon and transgresses this public right.

142.    Gurnee Defendants knew or should have known that the levels of EtO gas emitted from their Gurnee Facility would have a deleterious effect upon the health, safety, and well-being of people living in the nearby areas.

143.    Gurnee Defendants' operation of their Gurnee Facilities caused those who live in the surrounding area to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

144.    As a proximate result of the Gurnee Defendants' operation of the Gurnee Facility, Plaintiff and the general public's common right to breathe clean air without dangerous levels of carcinogens such as EtO was eliminated and/or severely diminished.

145.    As a proximate result of Gurnee Defendants' operation of their Gurnee Facility, EtO continuously invaded and contaminated the areas surrounding Plaintiff's and Class Members' residences, thereby exposing them to EtO.

146.    As a direct and proximate result of Gurnee Defendants' creation of a public nuisance and the exposure to EtO resulting therefrom, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease, or disease processes, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, diseases, or disease processes. Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

## COUNT V

## PRIVATE NUISANCE—WAUKEGAN DEFENDANTS

147.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

148.    At all times relevant hereto, Waukegan Defendants, as successors and owners of the Waukegan Facility, knew EtO to be hazardous and harmful to human beings.

149.    Waukegan Defendants' unreasonable use and emission of EtO from their Waukegan Facility constituted an unreasonable invasion of Plaintiff's and the Class Members' interests and rights of reasonable use and enjoyment of their properties and their rights to enjoyment of life free from breathing toxic air contaminants.

150.    Waukegan Defendants' unreasonable use and emission of EtO from their Waukegan Facility constituted negligent or reckless conduct.

151.    Waukegan Defendants' unreasonable use and emission of EtO from their Waukegan Facility was an ultrahazardous or abnormally dangerous condition or activity and thus constitutes an absolute nuisance, or nuisance per se, for which Defendant is strictly liable.

152.    Waukegan Defendants' operation of their Waukegan Facility caused those who live in the surrounding area to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

153.    As a proximate result of the Waukegan Defendants' operation of their Waukegan Facility, Plaintiff and the Class Members' common rights to breathe clean air without dangerous levels of carcinogens such as EtO were infringed and/or severely diminished.

154.    As a proximate result of Waukegan Defendants' operation of their Waukegan Facility, EtO continuously invaded and contaminated the areas surrounding Plaintiff's and Class Members' residences, thereby exposing them to EtO.

28

155.     As a direct and proximate result of Waukegan Defendants' creation of a private nuisance and the exposure to EtO resulting therefrom, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease, or disease processes, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, diseases, or disease process.  Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

## COUNT VI
## PRIVATE NUISANCE—GURNEE DEFENDANTS

156.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

157.     At all times relevant hereto, Gurnee Defendants, as successors and owners of the Gurnee Facility, knew EtO to be hazardous and harmful to human beings.

158.     Gurnee Defendants' unreasonable use and emission of EtO from their Gurnee Facility constituted an unreasonable invasion of Plaintiff's and the Class Members' interests and rights of reasonable use and enjoyment of their properties and their rights to enjoyment of life free from breathing toxic air contaminants.

159.     Gurnee Defendants' unreasonable use and emission of EtO from their Gurnee Facility constituted negligent or reckless conduct.

160.     Gurnee Defendants' unreasonable use and emission of EtO from their Gurnee Facility was an ultrahazardous or abnormally dangerous condition or activity and thus constitutes an absolute nuisance, or nuisance per se, for which Defendant is strictly liable.

161.     Gurnee Defendants' operation of their Gurnee Facility caused those who live in the surrounding area to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

162.     As a proximate result of the Gurnee Defendants' operation of their Gurnee Facility, Plaintiff and the Class Members' common rights to breathe clean air without dangerous levels of carcinogens such as EtO were infringed and/or severely diminished.

163.     As a proximate result of Gurnee Defendants' operation of their Gurnee Facility, EtO continuously invaded and contaminated the areas surrounding Plaintiff's and Class Members' residences, thereby exposing them to EtO.

164.     As a direct and proximate result of Gurnee Defendants' creation of a private nuisance and the exposure to EtO resulting therefrom, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease or disease process, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease or disease processes.  Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

## COUNT VII

## NEGLIGENCE—WAUKEGAN DEFENDANTS

165.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

166.     As successor and owner of the Waukegan Facility, Waukegan Defendants owed Plaintiff and Class Members a duty to operate their Waukegan Facility in a manner which would not cause Plaintiff and Class Members injury or harm, and Plaintiff and Class Members were foreseeable victims located within the scope of the risk created by Waukegan Defendants' conduct.

167.     Waukegan Defendants negligently breached their duty of care by emitting dangerous levels of EtO from their Waukegan Facility, by failing to take steps to minimize or eliminate the release of EtO, by failing to utilize alternative procedures that would not result in the release of EtO, failing to use proper materials in constructing the plant, failing to institute proper

30

procedures and training for response to releases of toxic EtO, and by releasing EtO into a heavily populated community.

168. Waukegan Defendants owed Plaintiff and Class Members a duty of reasonable care commensurate with the risk of operating the Waukegan Facility.

169. Given the likelihood of contamination of neighboring areas and exposure to their residents, Waukegan Defendants had a duty to investigate the extent to which EtO released from the Waukegan Facility was likely contaminating the air at levels to materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

170. Waukegan Defendants negligently breached their duty by, *inter alia:*

    a. Emitting dangerous amounts of EtO into the air;

    b. Failing to employ safe methods to adequately control or eliminate EtO emissions from the plant;

    c. Failing to use alternative procedures which would not result in the emission of EtO into neighboring communities;

    d. Failing to locate its EtO processing to an unpopulated, or at least much less populated, area; and

    e. Failing to warn neighboring residents that they were being exposed to EtO and of the consequent risks of disease the residents acquired because of that exposure.

171. As a direct and proximate result of Waukegan Defendants' negligence and their exposure to EtO, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness and disease, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease, or

disease processes. Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

## COUNT VIII

## NEGLIGENCE—GURNEE DEFENDANTS

172. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

173. As successor and owner of the Gurnee Facility, Gurnee Defendants owed Plaintiff and Class Members a duty to operate their Gurnee Facility in a manner which would not cause Plaintiff and Class Members injury or harm, and Plaintiff and Class Members were foreseeable victims located within the scope of the risk created by Gurnee Defendants' conduct.

174. Waukegan Defendants negligently breached their duty of care by emitting dangerous levels of EtO from their Waukegan Facility, by failing to take steps to minimize or eliminate the release of EtO, by failing to utilize alternative procedures that would not result in the release of EtO, failing to use proper materials in constructing the plant, failing to institute proper procedures and training for response to releases of toxic EtO, and by releasing EtO into a heavily populated community.

175. Gurnee Defendants owed Plaintiff and Class Members a duty of reasonable care commensurate with the risk of operating the Gurnee Facility.

176. Given the likelihood of contamination of neighboring areas and exposure to their residents, Gurnee Defendants had a duty to investigate the extent to which EtO released from the Gurnee Facility was likely contaminating the air at levels to materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

177. Gurnee Defendants negligently breached their duty by, *inter alia:*

      a. Emitting dangerous amounts of EtO into the air;

b.   Failing to employ safe methods to adequately control or eliminate EtO emissions from the plant;

c.   Failing to use alternative procedures which would not result in the emission of EtO into neighboring communities;

d.   Failing to locate its EtO processing to an unpopulated, or at least much less populated, area; and

e.   Failing to warn neighboring residents that they were being exposed to EtO and of the consequent risks of disease the residents acquired because of that exposure.

178.   As a direct and proximate result of Gurnee Defendants' negligence and their exposure to EtO, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness and disease, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease, or disease processes. Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

## COUNT IX

## WILLFUL AND WANTON CONDUCT—WAUKEGAN DEFENDANTS

179.   Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

180.   At all times relevant, Waukegan Defendants, as successor and owners of the Waukegan Facility, owed a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and those living in the areas surrounding its plant.

33

181.    Upon information and belief, Waukegan Defendants were, at all times relevant, aware that EtO is highly carcinogenic, mutagenic and/or otherwise harmful to humans.

182.    Upon information and belief, Waukegan Defendants were, at all times relevant, aware of the considerable health risks associated with the emission of EtO from the Waukegan Facility, including the risk of causing various forms of cancer in the surrounding population.

183.    Upon information and belief, Waukegan Defendants were, at all times relevant, aware that their use of EtO for sterilization services at the Waukegan Facility actually resulted in the unreasonably dangerous emission of EtO into the surrounding communities.

184.    Notwithstanding this actual knowledge, Waukegan Defendants breached their duties by, among other things:

    a.  Emitting dangerous amounts of EtO into the air;

    b.  Failing to employ safe methods to adequately control EtO emissions from the Waukegan Facility;

    c.  Failing to use alternative procedures which would not result in the emission of EtO into neighboring communities;

    d.  Failing to locate its EtO processing facilities in an unpopulated or less populated area;

    e.  Failing to warn neighboring residents that they were being exposed to EtO and of the consequent risks of disease the residents acquired because of that exposure;

    f.  Failing to take steps to minimize or eliminate the release of EtO, by failing to utilize alternative procedures that would not result in the release of EtO

    g.  Failing to use proper materials in constructing the plant; and

34

h. Failing to institute proper procedures and training for response to releases of toxic EtO.

185. Waukegan Defendants' failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable EtO emissions constitutes willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and those living in the areas surrounding their Waukegan Facility.

186. As a direct and proximate result of Waukegan Defendants' willful, wanton, reckless and outrageous conduct, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease, or disease processes, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease, or disease processes. Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection, which has been made reasonably medically necessary as a result of Defendants' conduct.

## COUNT X

## WILLFUL AND WANTON CONDUCT—GURNEE DEFENDANTS

187. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

188. At all times relevant, Gurnee Defendants, as successor and owners of the Gurnee Facility, owed a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and those living in the areas surrounding its plant.

189. Upon information and belief, Gurnee Defendants were, at all times relevant, aware that EtO is highly carcinogenic, mutagenic and/or otherwise harmful to humans.

190.    Upon information and belief, Gurnee Defendants were, at all times relevant, aware of the considerable health risks associated with the emission of EtO from the Gurnee Facility, including the risk of causing various forms of cancer in the surrounding population.

191.    Upon information and belief, Gurnee Defendants were, at all times relevant, aware that their use of EtO for manufacturing surfactants at the Gurnee Facility actually resulted in the unreasonably dangerous emission of EtO into the surrounding communities.

192.    Notwithstanding this actual knowledge, Gurnee Defendants breached their duties by, among other things:

    a.  Emitting dangerous amounts of EtO into the air;

    b.  Failing to employ safe methods to adequately control EtO emissions from the Gurnee Facility;

    c.  Failing to use alternative procedures which would not result in the emission of EtO into neighboring communities;

    d.  Failing to locate its EtO processing facilities in an unpopulated or less populated area;

    e.  Failing to warn neighboring residents that they were being exposed to EtO and of the consequent risks of disease the residents acquired because of that exposure;

    f.  Failing to take steps to minimize or eliminate the release of EtO, by failing to utilize alternative procedures that would not result in the release of EtO

    g.  Failing to use proper materials in constructing the plant; and

    h.  Failing to institute proper procedures and training for response to releases of toxic EtO.

36

193.    Gurnee Defendants' failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable EtO emissions constitutes willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and those living in the areas surrounding their Gurnee Facility.

194.    As a direct and proximate result of Gurnee Defendants' willful, wanton, reckless and outrageous conduct, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease, or disease processes, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease, or disease processes. Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection, which has been made reasonably medically necessary as a result of Defendants' conduct.

## COUNT XI

## MEDICAL MONITORING—ALL DEFENDANTS

195.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

196.    Plaintiff and Class Members have been significantly exposed to EtO levels that are far higher than normal background levels. EtO is a dangerous carcinogen that has been proven to cause cancer in humans.

197.    Plaintiff and Class Members came into direct contact with EtO due to Defendants' tortious actions.

198.    As a proximate result of their exposure to EtO, Plaintiff and Class Members have a significantly increased risk of contracting several different types of cancer. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

37

199. Monitoring procedures exist that makes early detection of these cancers possible. These monitoring procedures are different than those normally recommended in the absence of toxic exposures and are reasonably necessary due to Plaintiff's and Class Members' exposures to EtO.

200. As a result, Plaintiff and the Class should be awarded the quantifiable costs of such a monitoring regime.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

a. For an Order certifying the Class, as defined herein, and appointing Plaintiff and their Counsel to represent the Class;

b. For an award of damages, including nominal and compensatory damages, as allowed by law and in an amount to be determined;

c. For an award to fund a medical monitoring program in an amount determined just and reasonable;

d. For an award of punitive damages as allowed by law and in an amount to be determined;

e. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f. For prejudgment interest on all amounts awarded;

g. For injunctive and declaratory relief, under Rule 23(b)(2) and (c)(4) and as otherwise allowed by law, including,

      i. Injunctive relief under 23(b)(2) as necessary and appropriate to establish a court-supervised program of medical monitoring for the

medically necessary diagnostic testing for the early detection of illness, disease, or disease processes; and

ii.  Issue certification under Rule 23(c)(4) as necessary and appropriate to provide declaratory relief as to each element of each cause of action alleged herein (negligence, ultrahazardous activity/strict liability, willful and wanton conduct, public nuisance, private nuisance, medical monitoring); and

h.  Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

The undersigned hereby demands a jury trial as to all issues so triable.

Date: September 21, 2020

*/s/ Lisa B. Weinstein*
Lisa B. Weinstein
GRANT & EISENHOFER P.A.
30 N. LaSalle Street, Suite 2350
Chicago, IL 60602
lweinstein@gelaw.com
P: (312) 610-5350
F: (312) 214-0001

M. Elizabeth Graham*
Adam J. Gomez*
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
egraham@gelaw.com
agomez@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

T. Michael Morgan*
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

John A. Yanchunis*
Marcio W. Valladares*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
jyanchunis@ForThePeople.com
mvalladares@ForThePeople.com
P: (813) 223-5505
F: (813) 223-5402

Rene F. Rocha*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
400 Poydras St., Suite 1515
New Orleans, LA 70130
rrocha@ForThePeople.com
P: (954) 318-0268
F: (954) 327-3018

Frank M. Petosa*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
8151 Peters Road
4th Floor
Plantation, FL 33324
fpetosa@ForThePeople.com
P: (954) 327-5366
F: (954) 327-3018

*Pro Hac Vice forthcoming

Attorneys for the Plaintiff and
the Putative Class